CHAPMAN V. GREENE *et al.*

1. The specifications in a bill of exceptions are sufficient, though the particular findings alleged to be unsupported by the evidence are not pointed out, where appellant proposed findings of fact in which the whole theory of the case was presented and then stated wherein the evidence was insufficient to support the findings, setting out the evidence.

2. The evidence in an action of claim and delivery for cattle claimed under a mortgage held to show that the mortgagor had such title and interest in the property, as owner, as authorized him to execute the mortgage, and render it valid against the estate of his deceased partner.

3. It is error, in an action of claim and delivery, to admit in evidence a judgment record against plaintiff, who was not a party to the judgment, and which did not form a link in defendant's chain of title.

4. It is reversible error to admit improper evidence, which, if proper, would be conclusive against the party objecting thereto, though the cause is tried by the court without a jury.

(Opinion filed November 17, 1904.)

Appeal from circuit court, Pennington county; Hon. LEVI McGEE, Judge.

Action in claim and delivery by Nellie H. Chapman against Daniel W. Greene and S. Josie Hill. From a judgment for defendant Hill, plaintiff appeals. Reversed.

*Fred H. Whitfield (M. D. Tyler, of counsel)*, for appellant.

The rights of innocent third parties do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance. Cowdrey v. Vandenburgh, 154 U. S. 659; Looney v. District of Columbia, 113 U. S. 261; McLaughlin v. District of Columbia, 116 U. S. 489; Hirsh v. Norton, 115 Ind. 343, 17 N. E. 613; Dymock v. Missouri, etc., Ry. Co., 54 Mo. App. 410; Bangor Electric, etc., Co. v. Robinson, 52 Fed. 521; Babcock v. Peoples Sav. Bank, 118 Ind. 213, 20 N. E. 733; Wampol v. Kountz, 14 S. D. 334.

Ratification of part of an indivisible transaction is ratifica-

tion of the whole.   Rev. Stat. S. D. Sec. 1669; 2 Herman on Estoppel, Sections 1073. 1074, 1075, 1088; Wynkoff v. Johnson, 2 So. Dak. 91, 48 N. W. 837; Union Trust Co. v. Phillips, 7 So. Dak. 225, 63 N. W. 903.

An officer's return upon a writ is conclusive of the facts properly stated therein, between the parties to the suit, and all those claiming under them as privies.   Von Roy v. Blackman, Fed. Cases No. 16,997, (3 Woods) 98; Rader v. Adamson, 37 W. Va. 582, 16 S. E. 808; Birch v. Frantz, 77 Ind. 199; Ex Parte St. Louis I. M. & S. Ry. Co., 40 Ark. 141; Tillman v. Davis, 73 Am. Dec. 786; Chambers v. King Iron Co., 16 Kan. 270; Frasier v. Williams, 15 Minn. 288; Tullis v. Brawley, 3 Minn. 277; Delinger v. Higgins, 26 Mo. 180; Wendell v. Mugridge, 19 N. H. 109; Columbus Ins. Co. v. Force, 8 How. Pr. 353.

The exclusion of proper evidence which is evidently material and important, and would probably change the result, is fatal.   Abbott's Trial Brief, p. 253 note 3 and 254 note 5; Bright v. Ecker, 9 So. Dak. 449; Plymouth County Bank v. Gilman, 4 S. D. 265; Affirming same case, 3 S. D. 170; State v. Security Bank, 2 S. D. 538; Re Carpenter, 79 Cal. 382, 21 Pac. 835; McNamara v. New Melleray, 88 Iowa 502, 55 N. W. 322.

*Frank D. Bangs,* for respondent.

In equity an estoppel in pais must be pleaded when it constitutes the basis of the right to sue or ground of relief.   Bean v. Crall, 57 N.W. 313; Cicotte v. Gagnier, 2 Mich. 281; Moran v. Palmer, 13 Mich. 467; Connerton v. Millar, 41 Mich. 608; Dale v. Turner, 34 Mich. 405.

And when a party has an opportunity to plead an estop

pel, and voluntarily omits to do so and goes to issue on the facts, he thereby waives the estoppel, and the jury is at liberty to find according to the facts of the case. VIII Encl. P. & P., page 13.

Another essential element of an estoppel by misrepresentation or concealment is that one party should have relied upon the conduct of the other and been induced by it to act or to refrain from acting so that he will be substantially injured if the other party should be allowed to repudiate his action. And this rule applies as well where the conduct of the party to be estopped consists of silence as where it consists of positive acts. 11 Enc. Law 536 (6)—438 and notes; Gleckler v. Slavens, 5 S. D. 375-376; Whitacre v. Culver, 8 Minn. 133; Northern Co. v. Platt, 22 Minn. 416.

The conduct and statements of a party never operate as an estoppel in favor of another party where the latter is not influenced thereby in his subsequent actions and to his prejudice. M'Abe v. Thomson, 17 Minn. 135; Murphy v. Clayton, 113 Cal. 150; Dean v. Crall, 57 N. W. 813; Palmer v. Williams, 24 Mich. 328; Parliman v. Young, 2 Dak. 185.

Death of a partner *ipso facto* dissolves a partnership, and notice thereof is not necessary to relieve the estate of the deceased partner from liability on contracts made by the surviving partners, even though they continue the business in the firm name. The doctrine of holding out has never been applied to such a case. 22 Eng. & Am. Enc. Law 57, 178-note 1.

Death revokes a power of attorney. McClaskey v. Barr, 50 Fed. 712; Donald v. Black, 55 Am. Dec. 448; Michigan Ins. Co. v. Leavenworth, 30 Vt. 11.

CORSON, P. J.  This is an action in claim and delivery to recover the possession of certain live stock alleged to be in the possession of the defendants.  Findings and judgment being in favor of the defendant S. Josie Hill, the plaintiff has appealed to this court.

In 1894 one Doty and the defendant Greene were in possession of a ranch, irrigating ditch, and certain live stock in Pennington county.  In March, 1896, Doty conveyed his interest in the real property to one David Hill, the husband of the respondent, and the defendant Greene.  On March 16, 1896, a contract was entered into between the said Hill, party of the first part. and said Greene, party of the second part, in which. it was agreed that the said Hill should sell to the said Greene, and the said Greene should purchase, an undivided one-third interest in the rach property above referred to, and also an undivided one-third interest in and to "all the farming tools, implements, wagons, buggies and live stock, of every name, nature and description, now and hereafter to be kept and placed thereon including the increase of live stock for the sum of $5,000, payable in lawful money of the United States, in improvements already and hereinafter to be made" by the said Greene upon the premises above described, and "in live stock already and hereinafter to be delivered" to the said Hill, "at a cost and price to be mutually agreed upon by the parties" thereto, which said money, improvements already made, and to be made, and the live stock already and thereinafter to be delivered, shall aggregate the sum of $5,000, "from time to time in money, improvements and live stock, on or before the first day of November, 1900, which said payments of money, improvements and live stock as made from time to time shall be endorsed

upon said contract." And the said Greene agrees to pay "his one-third share of all state and county taxes or assessments of whatever nature which are or may become due upon the prem- ises above described and his one-third share of all the neces- sary expenses already and hereafter to be incurred in the care, keeping, etc., of said personal property and the maintenance, management and procuring of said real estate above describ- ed." And the said Hill "on receiving such payment at the times and in the manner above mentioned covenants and agrees to make, execute and deliver a good and sufficient deed for the conveying and assuring" to the said Greene or to such person as he may designate in writing, "the title to an undivided one- third of the above-described premises including a like interest in and to the water rights above described free and clear of all incumbrance save a mortgage for $7,000 in favor of E. L. Doty and a bill of sale for an undivided one-third interest in and to all personal property kept upon the said premises and situate thereon." It was further stipulated therein that in case the said Greene should "fail to pay in money, improvements and live stock   *   *   *   the whole amount of $5,000," then the said Hill covenants and agrees "to make, execute and deliver to said" Greene, or such person as he may designate in writing, a good and sufficient deed for the conveying and assuring to the said Greene the title to as much of an undivided interest as he shall have paid for, upon the basis of $5,000 for an undivided one-third interest, free and clear of all incumbrances, save the mortgage above referred to, and a bill of sale of a like interest in and to all the personal property kept on said premises; it being expressly and mutually agreed that there should be no forfeiture, after payment once made, of the amounts of said

payments, nor damages for failure or inability of said party of the second part to purchase the undivided one-third interest. On the same day an additional agreement was made between the said parties by which it was agreed that Hill should pay the said Greene $25 per month, and that said Greene should devote all his time and attention to the performance of such duties and services as might be required of him by the said Hill; and it was further agreed that in event said Greene should purchase an interest in and to the said stock ranch and appurtenances, and the personal property kept and situated thereon, then it was understood and agreed that said undivided interest should bear its proportionate share of the expenses, including the salary above referred to.

It appears from the evidence that Greene had charge of the ranch, and had purchased a large number of pure-bred animals, prior to March, 1896, taking the title and registering the same in his own name, and that he continued to transact the business in the same manner after the said date, and from time to time disposed of portions of said stock, made mortgages and transfers in his own name, hired and discharged the men upon the ranch paying out over $25,000 by checks drawn in his name, and practically conducted all the business on the ranch, so far as the live stock was concerned, up to the time of the death of Hill, in March, 1900. And during the time that he was so conducting the business he executed a mortgage upon the said stock to the First National Bank of Rapid City for the sum of $800, which was subsequently, at the request of the said Greene, taken up by the plaintiff, who also loaned to the said Greene $600, for which he executed a note and mortgage upon said live stock. It is to recover the property so mortgaged to the bank and herself that this action was instituted.

The court, in its findings, found, in substance, that the said Greene had no interest in the said property, and that the mortgages so made by him were invalid, and not binding on the defendant S. Josie Hill. The appellant contends that inasmuch as the title to the live stock was in Greene, and the stock registered in his name, he had such an interest therein as owner, or as a partner of said Hill, as gave him a right to execute said mortgages, and that the plaintiff's mortgages are therefore valid and binding upon the estate of the said Hill, deceased.

Before proceeding to discuss the merits of the case, there is a preliminary question to be considered. It is contended by the respondent that there are no such specifications in the bill of exceptions as are required by the Code. This contention is clearly untenable. The plaintiff not only proposed findings of fact, in which the whole theory of her case was presented, but she set out particularly wherein the evidence is insufficient to support the findings, as appears from the following specification: "That ever since the year 1894 the defendant Daniel W. Greene has had a property interest in the Doty Ranch and the personal property herein described, including the original stock from which the mortgaged property in controversy sprung. * * * That from the date of said contract until the month of June, 1900, the defendant Daniel W. Greene was the actual and sole manager of all the personal property belonging to said Hill & Greene. That said Greene paid the taxes thereon, employed and discharged the foreman and laborers who did the work, bought cattle in his own name from funds furnished by Hill and himself, and placed same upon said ranch, and took title thereto in his own name. That he bred, classified, registered, bought,

and sold in his own name, and handled as his own all the personal property and cattle belonging to Hill & Greene, kept upon said old Doty Ranch. That he made mortgages upon the same to secure the payment of debts for said Hill & Greene, and between the date of said contract and June, 1900, said Greene advanced several thousand dollars of money from his own private means, aside from any money derived 'from said Hill and the sale of stock for and on account of said Doty Ranch under his contract of March, 1896." While it is true that the plaintiff has not specified the particular findings which were unsupported by the evidence, she has pointed out very specifically the reasons why the findings in favor of the defendant were not supported by the evidence, and the reasons why the findings should have been in favor of the plaintiff. We are of the opinion, therefore, that the plaintiff has fully complied with the provisions of the Code in this respect.

This brings us to the merits of the case.

It will be noticed that the first contract entered into between the said Hill and Greene contained some peculiar and ambiguous provisions. It will be observed that an undivided one-third interest in the property was to be conveyed to Greene upon the payment specified, which shall aggregate the sum of $5,000. It will be seen from this stipulation that improvements had already been made by Greene, and live stock already delivered by him, at the time the agreement was entered into. The second agreement was also somewhat ambiguous. and it is only by understanding the situation of the parties at the time the agreements were entered into that a fair and reasonable construction can be given to them. And after a very full consideration of the evidence and the peculiar circumstances sur-

rounding the parties and the transactions, we are of the opinion that the court's findings are not sustained by the prepon derance of the evidence, but that the preponderance is clearly in favor of the plaintiff.

The principal witness on the part of the plaintiff was the defendant Greene, and, in order that we may understand and properly consider the construction to be given the contracts, it will be necessary to give the more material parts of his evidence in this opinion. Mr. Greene, in his deposition, testified as follows: "I reside at Washington, D. C. My occupation is, and has been for the last five or six years, examiner of pensions. I am one of the defendants in this action. Since 1894 I have been continuously interested in the Doty Ranch. I first purchased an interest in it about 1894, when Mr. Doty and myself made improvements and conducted the affairs of the ranch about a year, when Captain Hill came West, and became a third partner. A year or two later Hill & Greene purchased the Doty interest, and we continued to run the entire property until the death of Captain Hill. * * * There was a clearly stated and agreed upon duty in regard to the management of the ranch and stock, under Captain Hill's personal suggestion, and by his approval, for both he and myself to perform. This was recognized and lived up to by both of us, and neither of us attempted to interfere with the duties of the other. * * * At the time of the transfer from Mr. Doty to Hill & Greene, the personal property was conveyed to me, and the real estate to Captain Hill. This was by mutual agreement, to enable me, as the one in charge, to more easily buy, sell, register, and breed the live stock intelligently. It was not desired by either of us to conflict with the other's duties. I had personal charge of

certain portions of the work until the death of Captain Hill; particularly directing the buying and selling of all the live stock, its breeding, crossing, and registration; keeping records of the pedigrees and of the grades. I paid the expenses, including taxes, wages of the men, supplies, freight, feed, and that part of it. Captain Hill paid particular attention to the crops and the land part of the concern, and at all times we worked in perfect harmony and hearty co-operation in all the branches. Captain Hill was fully advised and counseled with in all steps taken by me, particularly in regard to buying and selling cattle, and the receipts and disbursements of funds. When he was not in South Dakota, I wrote him fully and often concerning all matters I had in charge. Under the name of Hill & Greene I purchased, and authorized our foreman to purchase, needed supplies, feed, grain, provisions, and other articles used at the ranch, and carried accounts with all of the leading merchants and business men in and about Rapid City in the name of Hill & Greene. I personally paid for these supplies from money derived from the proceeds of these [plaintiffs] mortgages and others, sales of stock, my own money, and that furnished by Captain Hill. I carried on the business from my own resources, money, live stock, and property which I was constantly putting into the concern under my contract with Captain Hill; from the sale of stock, moneys borrowed at the banks and elsewhere, which was secured by chattel mortgages upon the cattle; and from the moneys which Captain Hill advanced from time to time for that purpose. I made several different mortgages to the First National Bank of Rapid City; one to the Tom Sweeney Hardware Company; one to Joseph May; another to the plaintiff, Mrs. Nellie H. Chapman, to se-

cure the payment of $600, mentioned in the complaint in this action; a chattel mortgage for $7,000 upon the stock, besides a real estate mortgage to secure the same debt to John W. Simp- son; and a mortgage to the Sioux Falls Bank, upon the live stock, to secure it for money which I borrowed to winter the live stock during the first winter. The records of Pennington county will show these mortgages. On March 7, 1899, we were indebted to the First National Bank of Rapid City in the sum of $800; we had owed them more prior thereto, but that was the balance at that time; and on that date I made my note and mortgage to the First National Bank to secure the pay- ment of $800. Before this indebtedness became due the presi- dent of the bank indicated that he wanted the loan paid when due, and being without money of our own, I arranged with Mrs. Chapman to take up the $800 note and mortgage from the bank when it became due, but at a reduced rate of interest. * * * In regard to the $600 mortgage of March 2, 1900, we were indebted to various persons in the regular course of busi- ness, and were without funds. We made a sale to Mrs. Chap- man of $600 worth of live stock, and delivered it to her; and in addition to that we borrowed $600 from her, giving as security my note and the mortgage mentioned in the complaint. This money was all received in the regular course of business, and these mortgages were given by me, as others had been, to se- cure the payment of those debts. Captian Hill knew fully of my arrangment, the conduct of the business, and the several purchases as they occurred. We talked the matter over many times before and after the contracts were entered into, and it was mutually agreed by us that because of my experience in the breeding and handling of live stock, and being so near the

ranch during the major part of my time, I could handle it to better advantage than he; and for that reason, and because during most of the time he would be in Easthampton, Mass., or away from the ranch, he would not undertake that part of it. He insisted repeatedly upon my taking full charge of that part of the work, which I accordingly did, with his full co-operation and his full knowledge of all my doings, until shortly before his death, and until his final illness. The proceeds of all these moneys derived from sales and mortgages on the stock, including this $800 mortgage to the bank, the $600 mortgage to Mrs. Chapman, and the $600 paid by her for stock, was all used in the interest of the ranch. Every cent of it went to pay for wages of men, taxes, provisions, freight, improvements, seed, etc. That money and thousands of dollars besides was spent in building up the ranch. * * * Exhibits A, H, 4, and 5 are certified copies of the mortgages * * * now owned by Mrs. Chapman, of which I am now testifying. I know the cattle therein described, which were all in my possession at one time or another during my connection with the ranch. As to where we got the cattle described in these mortgages, we purchased the original stock breeders; the rest came from the increase, and from purchases we made later. I personally superintended the purchase, breeding, and crossing of these cattle; had personal knowledge of their names, pedigrees, and numbers, as set forth in the mortgages. I selected many of them myself, in Iowa, Illinois, and eastern South Dakota. The original stock from which the mortgaged cattle were direct descendants were all registered in every herdbook, whether Shorthorn or Hereford or polled Durham, in my name, before Captain Hill came to the ranch or held any interest in

them.  *  *  *  I kept the funds for Hill & Greene in the First National Bank of Rapid City, and in the South Dakota National Bank of Sioux Falls. The account was in my individual name, as I drew all the checks, and signed them, 'D. W. Greene.' *  *  *  Not a cent of this firm money was used by me personally or for any personal use. On the other hand, I was constantly depositing money of my own, which was used for the business of the firm."

The evidence of Mr. Greene is practically undisputed, and very much of it is corroborated by the checks, mortgages, notes, vouchers, and records introduced in evidence in the case, and it was practically conceded that all of the stock was purchased and registered in the name of Greene. It would seem, therefore, that at the time that Hill and Greene entered into the contract on March 16, 1896, Greene was the owner of a portion of the ranch, and a part, if not all, of the pure-bred stock then on the ranch, and that Hill & Greene together purchased Doty's interest, giving him in part payment a mortgage for $7,000. It will thus be seen that Greene was not only interested in the ranch and in the live stock, but was clothed with the legal title to the same; and, being clothed with indicia of ownership and in possession, he had such an interest as authorized him to mortgage the same for the benefit of the parties, notwithstanding the contract on which the defendant Mrs. Hill relies. Construing the contract, therefore, in the light of the surrounding circumstances and conditions existing at the time it was executed, and the conduct of the parties subsequently to its execution, it does not support the contention of the defendant, Mrs. Hill, in her claim that Greene had no interest in the property, for the reason that Hill had never conveyed to him

the one-third interest therein specified. The subsequent conduct of Greene ·in the management of the business from the time of the execution of the contract until the death of Hill —a period of four years—with the apparent knowledge and approval of Hill shows very clearly that, so far as the live stock was concerned, Greene was recognized as having an interest in the same, or at least authority to mortgage and dispose of the same for the benefit of himself and Hill. This view is strengthened by the affidavit made by Hill and Greene to the $7,000 mortgage to Simpson in 1898, which reads as follows:

"We, David Hill, and D. W. Greene, being first duly sworn severally on oath depose and say that we are the mortgagors described in the within mortgage, payable to John W. Simpson, of No. 10 Wall Street, New York City, in the state of New York, the mortgagee named. We further state that we are the owners of all the property described in the within mortgage, and that we have not bargained, sold, or mortgaged said property, or any part thereof to any one; and that each and every item described in the within mortgage is clear and free from all incumbrances. [Signed] David Hill, D. W. Greene.

"Subscribed and sworn to before me this 10th day of Aug., 1898. [Signed] H. W. Somers, Notary Public. [Notarial Seal.]"

This view is further strengthened by the fact that in March, 1900, Greene disposed of four head of registered stock for the sum of $600, paid by the plaintiff in this action at about the time of the execution of the $600 mortgage; and that the same was delivered from the ranch to the husband of the plaintiff in the presence of Mrs. Hill, her brother, and a son of the

defendant and the deceased.   In other words, it is quite clear from the contract and the subsequent acts of the parties that Greene was the recognized owner, or at least the ostensible owner, of the pure bred registered cattle, for, as will be noticed, it nowhere appears that Greene had ever transferred to Hill the interest which he had originally in the pure-bred stock, or his interest in the ranch with Doty, prior to the time that Hill became interested in the same.   It clearly appears from the the statement of Greene, however, that he had an interest in the live stock and in the ranch at the time the contract was entered into, and that he continued to hold such interest up to the time of the death of Hill.   It is quite clear, also, that Hill recognized that interest, for as late as August, 1898, he made, as we have seen, an affidavit in which he stated that he and Greene are the owners of all the property described in the chattle mortgage executed by himself and Greene to Simpson, which included the live stock on the ranch.   And as before stated, it is assumed by the terms of the first contract that Greene had such an interest.   The second contract above referred to seems to have been regarded as not in force by either party, as Mr. Greene in his testimony, says in regard to that contract that it was made when we made the main contract, ''but never was enforced so as to allow me a salary or require me to spend my full time.   *   *   *   The necessity did not arise which obligated Captain Hill to pay me, or for me to give my entire time.''   The practical abandonment of that contract by the parties strengthens the view that Greene continued to have an interest in the property, as he seems to have had charge of a part of the business, without receiving any stipulated compensation.

It is further contended by the appellant that the court erred in admitting in evidence the judgment record of the county court in the proceedings of Daniel W. Greene, as petitioner, against S. Josie Hill, executrix of the estate of David Hill, deceased, in the county court of Pennington county. We agree with the appellant in this contention. The judgment.did not constitute a link in the chain of title of the defendant in this action, and the plaintiff was not a party to that proceeding; hence she was not bound by it, and it could not be introduced in evidence against her. No rule is better settled than that a party is not bound by a judgment to which he was not a party, except in a few exceptional cases, where the proceeding is in rem and binds the property, or where the judgment constitutes a link in the chain of title, and possibly one or two other exceptional cases. Freeman on Judgments, § 154; Black on Judgments, § 600; McPherson v. Julius, 17 S.D. 98, 95 N.W. 428. The question now before us was so fully discussed in the last above cited case that we do not deem a further discussion of it necessary.

If properly admitted, it was conclusive against the plaintiff, and the rule cannot, therefore, be invoked that the court, in its final decision, is presumed to have disregarded the incompetent evidence, but the case would come within the rule laid down in the case of Starkweather v. Bell, 12 S. D. 146, 80 N. W. 183. It is difficult to discover upon what theory the learned circuit court admitted this record in evidence.

The conclusion at which the court has arrived renders a reversal of the judgment necessary, and the ordering of a new trial. There are numerous other questions discussed in the briefs of counsel, but, as they may not arise upon another trial, we do not deem it necessary to discuss them in this opinion.

The judgment of the circuit court below and order denying a new trial are reversed, and a new trial is ordered.